IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DOYLE SHERMAN ARD          §
                           §
            Petitioner,    §
                           §
VS.                        §
                           §          NO. 3-07-CV-1127-D
RICK THALER, Director      §
Texas Department of Criminal Justice,   §
Correctional Institutions Division      §
                           §
            Respondent.    §

**FINDINGS AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Doyle Sherman Ard, a Texas prisoner, has filed an application for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.   For the reasons stated herein, the application should be

conditionally granted.

I.

A jury convicted petitioner of aggravated assault with a deadly weapon and sentenced him

to 40 years confinement.  His conviction and sentence were affirmed on direct appeal. *Ard v. State*,

No. 10-00-283-CR (Tex. App.--Waco, Oct. 30, 2002, pet. dism'd).   Petitioner also filed two

applications for state post-conviction relief.  The first application was dismissed because a direct

appeal was pending. *Ex parte Ard*, No. WR-58,788-02 (Tex. Crim. App. Nov. 24, 2004).   The

second application was denied without written order on findings of the trial court. *Ex parte Ard*, No.

WR-58,788-03 (Tex. Crim. App. Jun. 6, 2007).[1]  Petitioner then filed this action in federal district

court.

---

[1] The state court also denied petitioner's motion for post-conviction DNA testing under Chapter 64 of the Texas
Code of Criminal Procedure. *Ard v. State*, 191 S.W.3d 342 (Tex. App.--Waco 2006, pet. ref'd).

II.

In two grounds for relief, petitioner contends that he received ineffective assistance of counsel because his attorney:  (1) offered into evidence an audiotape recording of a post-arrest interview wherein petitioner admitted that he had served time in prison for a prior aggravated assault that was committed while he was intoxicated; and (2) failed to discover and call witnesses who would have testified that the victim was injured while trying to prevent petitioner from committing suicide.

A.

The Sixth Amendment to the United States Constitution guarantees a defendant reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980).  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonableness. *Id.*, 104 S.Ct. at 2064.  Second, the petitioner must prove that he was prejudiced by his attorney's substandard performance. *Id.* at 2067.

Where, as here, a state court has already rejected a claim of ineffective assistance of counsel, a federal court may grant habeas relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1); *see also Threadgill v. Quarterman*, No. 3-05-CV-2217-D, 2009 WL 2448499 at *5 (N.D. Tex. Aug. 10, 2009) (citing cases) (holding that both prongs of the *Strickland* test present a mixed question of law and fact that is reviewed under section 2254(d)(1)).  A state court decision is "contrary" to clearly

established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir.), *cert. denied*, 124 S.Ct. 2812 (2004), *citing Williams v. Taylor*, 529 U.S. 362, 406, 120 S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000). A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S.Ct. at 1523; *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). Factual determinations made by the state court are presumed to be correct and are unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Threadgill*, 2009 WL 2448499 at *5 (citing cases). This presumption applies not only to explicit findings of fact, but "it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Threadgill*, 2009 WL 2448499 at *5, *quoting Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001), *cert. denied*, 123 S.Ct. 106 (2002).

On federal habeas review, the district court reviews "only the ultimate decision of the state court, and not the specific contents of its reasoning or opinion." *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 2383 (2009). When the Texas Court of Criminal Appeals denies post-conviction relief without written order on findings of the trial court, the federal habeas court "(1) assumes that the state court applied the proper 'clearly established Federal law'; and (2) then determines whether its decision was 'contrary to' or 'an objectively unreasonable application of that law." *Threadgill*, 2009 WL 2448499 at *5, *quoting Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003), *cert. denied*, 124 S.Ct. 1156 (2004).

B.

In his first ground for relief, petitioner contends that he received ineffective assistance of counsel when his attorney offered into evidence an audiotape recording of a post-arrest interview wherein petitioner admitted that he had served time in prison for a prior aggravated assault that was committed while he was intoxicated.

1.

Petitioner was charged with intentionally or knowingly causing bodily injury to Robert Davis by shooting him with a firearm. (*See* St. App. Tr. at 9). In their opening statements, the prosecutor and defense counsel laid out their theories of the case to the jury. The prosecutor argued that petitioner, who was intoxicated at the time, intentionally shot Davis after the two men were involved in a heated discussion. (*See* SF-III at 9-10). Defense counsel maintained that Davis was accidentally shot while trying to prevent petitioner from committing suicide. (*Id.* at 14). As part of his strategy to explain why the police may have brought charges against petitioner, counsel briefly mentioned that his client was a twice-convicted felon, but he did not reveal the nature of those convictions. (*Id.* at 17).

At trial, Davis testified that he became intoxicated after drinking rum with petitioner at a New Year's Eve party in 1999. (*See* SF-III at 22, 44-45, 49). According to Davis, petitioner became upset while teaching Davis to play the guitar because he suspected that Davis and the other guests thought he was stupid. (*See id.* at 22, 99). Shortly before 10:00 p.m. that evening, petitioner and Davis left the party and went downstairs to an apartment petitioner shared with his mother. (*See id.* at 24-25, 53-54). Once inside the apartment, petitioner went to his bedroom, retrieved a gun from the closet, and stuck the gun in his pants. (*See id.* at 26-27, 79-80). As Davis sat on a stool next to petitioner's bed practicing notes on a guitar, petitioner put the gun to Davis's head and said, "Do you

think I'm a stupid mother-f----er now?" (*See id.* at 32-34). Davis said that he tried to grab the gun with his right hand, but the weapon discharged, striking him in the right middle finger. (*See id.* at 35-36, 85). Petitioner fired another shot as he followed Davis out of the bedroom and into the hallway. (*See id.* at 37-38, 107-08). The second shot grazed Davis in the left arm near the elbow. (*See id.* at 37). After Davis fell to the ground, he heard petitioner say that "he didn't mean to kill me, he didn't mean to shoot me but he had to do it." (*Id.* at 39). Petitioner then dropped the gun. (*Id.*). Upon learning that Davis was not seriously injured, petitioner "freaked" and exclaimed, "I shot you twice, you should be dead." (*See id.* at 39, 42). Davis tried to calm petitioner by telling him that the shooting was an accident, but petitioner reached for his gun again. (*Id.* at 39-42). Davis pushed petitioner out of the way and escaped through the front door of the apartment. (*Id.* at 42). The next day, petitioner apologized to Davis for what he had done. (*Id.* at 41).

On cross-examination, Davis admitted that he told a doctor at the hospital that the shooting was an "accident" and that he shot himself after "jacking around" with the gun. (*See id.* at 68-69, 75-76, 131). Similar references are contained in Davis's hospital records, which indicate that he suffered an "accidental GSW." (*See* Def. Exh. 6 at 6-7). Davis initially testified that he told the doctor the shooting was an accident because at the time, "I didn't know myself." (SF-III at 68). However, after a break, Davis recanted that testimony and told the jury he had lied. (*Id.* at 76). Davis later explained that he came to believe that petitioner intentionally shot him after experiencing nightmares about the incident. (*See id.* at 158-59). In addition to these inconsistencies, Davis gave the police a different account of events leading up to the shooting. Davis told the police just hours after the shooting that petitioner pulled out his gun after the two men got into an "argument over God." (*See* Def. Exh. 5). When asked about this statement at trial, Davis first denied that there had been any argument at all. (*See* SF-III at 97). Davis then changed his story, acknowledging that he

and petitioner argued at the party immediately before the shooting, but not downstairs in petitioner's apartment. (*Id.* at 97-99). Davis also told the police that he reached for petitioner's gun with his *left* hand while the two men were sitting on petitioner's bed. (*See* Def. Exh. 5). This testimony contradicts what Davis told the jury at trial--that he reached for petitioner's gun with his *right* hand while seated on a stool next to the bed. (*See* SF-III at 33-35, 85). Finally, Davis told the police that petitioner yelled "he was going to kill me" before firing the second shot that struck him in the left arm. (*See* Def. Exh. 5). Yet at trial, Davis said that petitioner never threatened to kill him. (*See* SF-IV at 194). When questioned at trial about the signed statement he gave the police, Davis said that the statement did not accurately reflect what he told the investigating officer. (*See* SF-III at 86-89, 94, 97-98, 101-02, 104-05, 131; SF-IV at 48, 86).

Only two other witnesses testified for the state--Alvarado Police Officer Jason Thomas and Detective Joshua Vincent. Thomas took petitioner into custody hours after the shooting. (*See* SF-III at 161-74).[2] Vincent interviewed petitioner in a jail cell after he was brought to the Johnson County Law Enforcement Center. (*Id.* at 206-10). The defense called three witnesses--Davis, Wyona Ard, and Theresa Seville. Davis testified that he told a doctor at the hospital that the shooting was an accident, that he shot himself with the gun, that he "blew [his] finger off," and that his wounds were "self-inflicted." (*See* SF-IV at 47, 64-65, 93, 192-93). He also admitted telling petitioner's mother, Wyona Ard, that the shooting was an accident. (*Id.* at 47). Wyona testified that she called the police after discovering blood on the floor and wall of her apartment because she feared that her son, who suffered from depression, had killed himself. (*Id.* at 105-06). When Wyona confronted Davis after the incident, Davis told her that the shooting was an accident and that "he believed with all his heart that God had sent him down [to the apartment] to save Doyle's life." (*Id.* at 124). The final defense

---

[2] Petitioner was arrested for outstanding traffic tickets, not for shooting Davis. (*See* SF-III at 208).

witness, Theresa Seville, was a hospital employee who authenticated Davis's medical records. (*Id.* at 146-87).

During his direct examination of Vincent, the prosecutor attempted to introduce a tape-recorded statement given by petitioner while in police custody. (*See* SF-III at 210). Defense counsel objected on the grounds that petitioner had not been given proper *Miranda* warnings and that the prosecutor failed to establish a proper predicate for admission of the tape. (*Id.* at 211). The prosecutor agreed with defense counsel and withdrew the offer. (*Id.*). However, while cross-examining Vincent, defense counsel laid the predicate for admission of the tape and offered it into evidence. (*See* SF-IV at 20-23). The tape recording was not played at that time. Nor was petitioner's tape-recorded interview mentioned again until the prosecutor asked to play the tape for the jury on rebuttal. (*Id.* at 144). Defense counsel, who did not listen to the recording in its entirety before offering the tape into evidence, asked the court to delete any mention of a prior aggravated assault conviction discussed by petitioner during his custodial interview. That request was denied. (SF-V at 5-16). The prosecutor then played the entire 30-minute tape-recorded interview with petitioner. (*See id.* at 22-43). At one point during the interview, Vincent asked petitioner:

> Q.    [BY VINCENT]:    Have you ever gotten angry before when you were intoxicated?
>
> A.    [BY PETITIONER]:  Yes, sir.
>
> Q:    Have you ever been in any trouble?
>
> A:    Yeah.
>
> Q:    What kind of trouble were you in?
>
> A:    Same kind of trouble.
>
> Q:    What's that? What happened in that? What were you arrested for? What were you charged with?

A:      Assault.

Q:      Assault.  Was a weapon involved?

A:      Yes, sir.

Q:      What kind of weapon?

A:      (Unintelligible) It was (unintelligible)[.][3]

Q:      Did you spend any time on that?

A:      Yeah.

Q:      How much time?

A:      Two years.

Q:      In state or county?

A:      State, pen.

Q:      Huntsville?

A:      Yes, sir.

(SF-V at 37-38).  Shortly after the jury started deliberations, it asked to hear the tape again.  (*See* St.

App. Tr. at 70, 76).  The tape-recorded interview, including petitioner's admission that he had served

time in prison for an aggravated assault that was committed while he was intoxicated, was then

played a second time.  (*See* SF-V at 165-68).  Three hours later, the jury found petitioner guilty.

On direct appeal, petitioner argued that his attorney was ineffective for offering the tape-

recorded interview into evidence.  While recognizing that petitioner may have been prejudiced by

the admission of the tape, the state appeals court concluded that the record was insufficient to

overcome the presumption that his attorney was "following a strategy he thought reasonable under

---

[3]   Although the trial transcript indicates that this, as well as other portions of the tape recording, are
"unintelligible," the state habeas record reflects that petitioner's prior assault conviction involved a deadly weapon.  *See
Ex parte Ard*, WR-58,788-03, Supp. Tr. at 30-31.

the facts." *Ard*, No. 10-00-283-CR, op. at 4-5.  However, on state collateral review, defense counsel

explained that his decision to offer the tape into evidence was not part of any trial strategy.  In an

affidavit filed with the state habeas court, Jim Howard Shaw stated:

> I did introduce the referenced tape interview without having listened
> to the entire tape.  I was ineffective.  I relied on what I believed to be
> the representation of counsels for the State, Lewis DesChamps and
> Walter Cleveland, that the tape did not contain a reference to a prior
> felony conviction.  My misunderstanding was that Applicant's tape
> made reference to an assault conviction in Harris County.  In fact, the
> two year conviction was for aggravated assault with serious bodily
> injury in Tarrant County.  I was ineffective because I did not
> recognize this distinction.  The Applicant was harmed thereby.  There
> was no strategy in letting this in.  It should have been excluded.  The
> strategy for the tape was to let the jurors meet the defendant, in case
> he chose not to testify.  The prior conviction information should have
> been excluded on my motion.  I was ineffective.  The court erred in
> failing to cure my ineffectiveness.  I asked the trial court to cure this
> error before the tape was published to the jury.  However, the trial
> court abused it's [sic] discretion in refusing to cure the error upon
> timely notice and objection by applicant's trial attorney.

*Ex parte Ard*, WR-58,788-03, Supp. Tr. at 43-44.  Despite these uncontroverted admissions by

defense counsel, the state habeas court found that "this single dereliction of his duty [ ] did not cause

Mr. Shaw's performance to fall below the wide range of professional assistance." *Id.*, Supp. Tr. at

31.  The state court further determined that the introduction of the tape did not prejudice petitioner

because, *inter alia*, the jury was instructed that it could consider any extraneous offenses committed

by petitioner only for limited purposes, and the evidence of guilt was sufficient to overcome "a single

and brief reference to a prior conviction [ ] involving a deadly weapon--a reference that was not

repeated or emphasized during the remainder of the trial." *Id.*  Petitioner now challenges that

decision on federal habeas review.

2.

The first inquiry under *Strickland* is whether Shaw's decision to offer into evidence

petitioner's tape-recorded interview with the police, without having first listened to the entire tape,

fell below an objective standard of reasonable professional conduct.    To establish a Sixth

Amendment violation, petitioner must prove that the performance of his attorney was

constitutionally deficient. *Strickland*, 104 S.Ct. at 2064. Counsel's performance is deficient if it falls

below "an objective standard of reasonableness" under then "prevailing professional norms." *Id.* at

2064-65.  As the Supreme Court explained:

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.  In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations unnecessary.
> In any ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.

*Id.* at 2066; *see also Smith v. Quarterman*, 471 F.3d 565, 569 (5th Cir. 2006), *cert. denied*, 127 S.Ct.

2256 (2007).

In this case, Shaw failed to conduct *any* independent investigation of the contents of the tape

before offering it into evidence.  When the prosecutor tried to introduce petitioner's tape-recorded

interview into evidence during the direct examination of Detective Joshua Vincent, Shaw objected

on two grounds:  (1) that petitioner had not been given proper *Miranda* warnings;[4] and (2) that the

---

[4] Vincent advised petitioner that any statements he made could be used "for or against him" in court. (*See* SF-
III at 213).  However, under Texas law, it is improper to warn an accused that statements made to the police during a
custodial interrogation may be used *for* him at trial.  *See Dunn v. State*, 721 S.W.2d 325, 341 (Tex. Crim. App. 1986),
*citing* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1981) ("[I]f the evidence is uncontroverted and uncontradicted
that the person who takes or obtains a written confession from the accused tells the accused that his confession might
be used 'for or against him,' or 'for and against him,' then this renders the confession inadmissible evidence at trial
because the warning does not comply with our State confession statute[.]").

prosecutor failed to establish a proper predicate for admission of the tape. (*See* SF-III at 211). The

prosecutor acknowledged the propriety of both objections and withdrew the offer. (*See id.*). Then,

inexplicably, Shaw offered the tape into evidence while cross-examining Vincent. (*See* SF-IV at 20-

23). When the prosecutor asked to play the entire tape-recorded interview for the jury on rebuttal,

Shaw objected to any mention of petitioner's prior aggravated assault conviction, arguing that he had

been misled by the prosecutor about the nature of that conviction. (*See* SF-V at 5-6). The prosecutor

countered that accusation in a hearing held outside the presence of the jury. At that hearing, the

prosecutor testified:

> We made the tape available to Mr. Shaw in the DA's office. We had
> a player available so he could listen to it if he wanted to. In the
> course of his discussion with me I advised him that our assistant Mr.
> Walt Cleveland, who is assisting me in the preparation of this case,
> had just finished listening to the tape for the first time and had made
> some preliminary notes as to what the tape said. And we would make
> those available to him but we weren't representing them to be the
> actual facts on the tape other than what Mr. Cleveland heard and
> recalled.
>
> Mr. Shaw indicated to us at that time that he would prefer not to have
> to listen to thirty minutes of the tape and he didn't avail himself of
> listening to the tape at that time and to my knowledge he never has,
> although the tape has been available. These notes counsel refers to
> are in no way offered by The State at that time nor now as an accurate
> reflection of the contents of the tape. The notes are mistaken where
> they say in 1985 he served two years out of Harris County for
> aggravated assault bodily injury. But the tape itself speaks for itself.

(*Id.* at 7-8). Later in the hearing, Shaw clarified that both he and the prosecutor started listening to

the tape, but it was of such poor quality that they did not listen to the entire recording. (*Id.* at 9-10).

Shaw also reurged his objection that he relied on notes given to him by the prosecutor indicating that

the conviction referenced by petitioner during his interview was for an assault in Harris County, not

for aggravated assault with serious bodily injury in Tarrant County. (*Id.* at 11-12). Regardless of

whether Shaw was misled by the prosecutor about the contents of the tape, one point is clear--he did

not listen to the entire recording before offering the tape into evidence. Had he done so, Shaw would

have discovered that petitioner admitted on the tape that he served two years in prison for the "same

kind of trouble" for which he was on trial--aggravated assault with a deadly weapon that was

committed while he was intoxicated.

Even Shaw acknowledged that his decision to put the tape before the jury, after successfully

objecting to the prosecutor's offer of the same evidence, was not based on any trial strategy. *See Ex

parte Ard*, WR-58,788-03, Supp. Tr. at 43-44. Still, the state habeas court found a strategic reason

for Shaw's use of the tape. In its Findings of Fact and Conclusions of Law, the state court wrote:

> The playing of the audio-taped interview of Applicant served two
> functions. First, it allowed the jury to hear both Applicant's claim
> that he did not remember what happened on the night of the shooting
> and the police raising the possibility that Applicant used the weapon
> in an attempted suicide without Applicant having to testify at the trial
> and being subjected to cross-examination. Secondly, the reference in
> the audio tape of a prior felony conviction furthered Mr. Shaw's
> strategy of insinuating that the impetus behind the police bringing
> charges against Applicant was his prior convictions and [ ] reminded
> the jurors that the priors would greatly affect their sentencing for this
> questionable offense.

*Id.*, Supp. Tr. at 30-31. But the state habeas court also found that "[h]ad Mr. Shaw listened to the

entire tape and knew of the deadly-weapon reference, he might have decided not to offer the tape into

evidence." *Id.*, Supp. Tr. at 31.

"The Supreme Court has indicated that a failure to investigate based on 'inattention, not

reasoned strategic judgment' is unreasonable[.]" *Ringo v. Roper*, 472 F.3d 1001, 1004 (8th Cir.),

*cert. denied*, 128 S.Ct. 445 (2007), *quoting Wiggins v. Smith*, 539 U.S. 510, 526-28, 123 S.Ct. 2527,

2537-38, 156 L.Ed.2d 471 (2003). Such is the case here. Shaw did not fully investigate the contents

of petitioner's tape-recorded interview with the police before developing his trial strategy. Only after

the tape was admitted into evidence did Shaw learn that the prior conviction mentioned by petitioner during his interview was for an aggravated assault that was committed while he was intoxicated--the same type of offense for which petitioner was on trial. On these facts, there can be little doubt that Shaw's decision to introduce the tape, without listening to it in its entirety, was deficient. *See, e.g. Lyons v. McCotter*, 770 F.2d 529, 533-34 (5th Cir. 1985), *cert. denied*, 106 S.Ct. 833 (1986) (even if defense counsel had a strategic reason for voluntarily introducing extraneous offense evidence, failure to exclude or limit evidence that petitioner had a prior conviction for aggravated robbery, the same offense for which he stood trial, was constitutionally deficient performance); *Garza v. Quarterman*, No. C-06-345, 2007 WL 788164 at *6 (S.D. Tex. Mar. 13, 2007) (failure of defense counsel to watch entire videotape of DWI arrest prior to trial was objectively unreasonable).

3.

The court next considers whether Shaw's deficient performance actually prejudiced petitioner's defense. "To demonstrate prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009), *quoting Strickland*, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. *Id.*, *quoting Strickland*, 104 S.Ct. at 2068. The ultimate focus of the prejudice inquiry is on "the fundamental fairness of the proceeding whose result is being challenged." *Virgil v. Dretke*, 446 F.3d 598, 612 (5th Cir. 2006), *quoting Strickland*, 104 S.Ct. at 2069. The court looks to "ferret[ ] out 'unreliable' results caused by 'a breakdown in the adversarial process that our system counts on to produce just results.'" *Id.*, *quoting Strickland*, 104 S.Ct. at 2069. While the test for prejudice is not simply whether there was sufficient evidence to convict the petitioner, "the strength of the incriminating evidence informs the determination of prejudice." *Bustamante v. Quarterman*,

284 Fed.Appx. 183, 188, 2008 WL 2645676 at *5 (5th Cir. Jul. 7, 2008), *citing Williams*, 120 S.Ct. at 1515.

The state's case against petitioner rested primarily on the credibility of Robert Davis, a recovering drug addict with two prior misdemeanor theft convictions and two prior DWI convictions who was intoxicated at the time of the shooting. (*See* SF-III at 43, 45, 49; SF-IV at 54-55, 57). Davis admitted to being "depressed" due to a number of personal problems, including his inability to work and the dissolution of his 21-year marriage. (*See* SF-III at 64, 80-82). He had taken himself off Prozac within two years of the incident, and told petitioner he was "tired of life." (*Id.* at 81; SF-IV at 54-55, 59). In addition to his questionable background and impaired mental state on the night of the shooting, Davis's trial testimony was riddled with inconsistencies, self-impeachment, and confusion. For example, Davis testified at trial that petitioner intentionally shot him, (SF-III at 158-59), but told his doctor that the shooting was an "accident" and "self-inflicted." (*See id.* at 68-69, 75). Davis explained that he told his doctor the shooting was an accident because at the time, "I didn't know myself." (*See id.* at 68). However, he later denied that he was unsure whether the shooting was an accident when he spoke to the doctor. (*See id.* at 76). Davis also testified at trial that he reached for petitioner's gun with his right hand while seated on a stool, (*see id.* at 33-35, 85), and that petitioner never threatened to kill him. (*See* SF-IV at 194). But in a statement given to the police just hours after the shooting, Davis said that he reached for petitioner's gun with his left hand while the two men were sitting on a bed, and that petitioner yelled "he was going to kill me" before firing the second shot that struck him in the left arm. (*See* Def. Exh. 5). Davis also told the police that he and petitioner "got into an argument over God" in the downstairs apartment immediately before petitioner pulled out a gun. (*Id.*). At trial, after initially denying that there had been an argument, Davis testified that he and petitioner exchanged words at the New Year's Eve party, but

not in the downstairs apartment. (*See* SF-III at 97-99). No mention was made by Davis at trial about

an "argument over God."

Because of these credibility issues, the state appeals court observed that "for the jury to learn

that [petitioner] had prior felony convictions, especially when one was for an aggravated assault, had

the potential to be highly damaging." *Ard*, No. 10-00-283-CR, op. at 4. Incredibly, the state habeas

court reached a different conclusion. In finding that the introduction of petitioner's tape-recorded

interview with the police did not prejudice the outcome of the trial, the state court wrote:

> [T]he introduction of the tape (1) allowed Applicant to inform the
> jury that he did not remember what transpired on the night of the
> shooting without exposing Applicant to vigorous and potentially
> damaging cross-examination, (2) allowed Mr. Shaw to reiterate his
> position that the police invented the suicide attempt so as to place a
> gun in Applicant's hand and that the prior convictions were the
> driving force behind the police bringing charges against Applicant,
> and (3) reminded the jury of the inequity of the sentence (due to the
> two priors) as compared to the facts of the underlying offense. In
> addition, the court's charge instructed the jury that it could not
> consider extraneous offenses committed by Applicant for any other
> purpose other than motive, intent, knowledge, or absence of mistake
> or accident in connection with the offense. The jury is presumed to
> follow the court's charge. And, given the sufficiency of the evidence
> in this case, the jury's finding of guilt was not affected by a single and
> brief reference to a prior conviction in involving [sic] a deadly
> weapon–a reference that was not repeated or emphasized during the
> remainder of the trial.

*Ex parte Ard*, WR-58,788-03, Supp. Tr. at 31 (internal citations omitted). Regardless of the reasons

given by the state court, the question on federal habeas review is whether the ultimate decision

involves an unreasonable application of the prejudice prong of the *Strickland* analysis. *See Blanton*,

543 F.3d at 236. The court concludes that it does.

Of primary significance to this determination is the type of evidence revealed to the jury

through petitioner's tape-recorded statement--that he had served time in prison for an aggravated

assault involving a deadly weapon that was committed when he was intoxicated. The Fifth Circuit and other courts have repeatedly recognized the highly prejudicial effect of extraneous offense evidence that involves conduct similar to the offense for which the defendant is charged. *See Lyons*, 770 F.2d at 534 (characterizing evidence of prior convictions that were similar to the charged offense as "highly prejudicial and incriminating"); *United States v. Preston*, 608 F.2d 626, 640 & n.18 (5th Cir. 1979), *cert. denied*, 100 S.Ct. 2162 (1980) (recognizing danger that a jury presented with extraneous offense evidence will think "once a criminal, always a criminal," and that "[t]he risk of prejudice may be particularly high where . . . the former crime is of the same nature as the one for which defendant is being tried"); *see also Dickson v. Sullivan*, 849 F.2d 403, 407-09 (9th Cir. 1988) (granting habeas relief where bailiff commented to two jurors that defendant had "done something like this before"); *United States v. Parker*, No. 05-CR-702, 2006 WL 1321483 at *2 (E.D. Pa. Apr. 14, 2006), *quoting United States v. Bagley*, 772 F.2d 482, 488 (9th Cir. 1985), *cert. denied*, 106 S.Ct. 1215 (1986) ("[W]here . . . the prior conviction is sufficiently similar to the crime charged, there is a substantial risk that all exculpatory evidence will be overwhelmed by a jury's fixation on the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again."); *Newsome v. James*, No. 96 C 7680, 2000 WL 1047822 at *1 (N.D. Ill. Jul. 27, 2000) ("[I]t is severely prejudicial to allow a jury to hear that a party earlier committed an act similar to the one at issue in the pending lawsuit because of the obvious tendency to conclude: 'He did it before, so it is not surprising that he did it again.'"). Even the admission of extraneous offense evidence that is not substantially similar to the charged offense has resulted in the granting of federal habeas relief. *See, e.g. Nero v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979) ("We can hardly imagine anything more prejudicial to Nero than allowing the jury in his armed robbery case to hear the prosecutor's comments that Nero had been convicted twice before of burglary and once on drug charges.");

*United States v. Thornton*, No. Civ. 04-28, 2005 WL 1993843 at *2-4 (E.D. Pa. Aug. 17, 2005)

(granting post-conviction relief where defense counsel inadvertently introduced unredacted copy of

police report containing a single reference to the fact that defendant, who was on trial for possession

of a firearm by a felon, was wanted for shooting someone with a handgun).   That this harmful

evidence came from petitioner's own lips only compounds the resulting prejudice.

Nor was the prejudicial effect of this evidence cured by the trial court's limiting instruction.

In its charge, the trial court instructed the jury that:

> [I]f there is any testimony before you in this case regarding the
> defendant's having committed an offense other than the offense
> alleged against him in the indictment in this case, you cannot consider
> said testimony for any purpose unless you find and believe beyond a
> reasonable doubt that the defendant committed such other offense, if
> any were committed, *and even then you may only consider the same
> in determining the motive, intent, knowledge, or absence of mistake
> or accident of the defendant*, if any, in connection with the offense,
> if any, alleged against him in the indictment in this case, and for no
> other purpose.

(St. App. Tr. at 64-65) (emphasis added).   Not only does this instruction not cure any prejudice

resulting from the admission of petitioner's tape-recorded statement, it all but invites the jury to

consider his prior aggravated assault conviction in determining the central issue in this case--whether

the shooting was intentional or accidental.   Indeed, the record shows that within 25 minutes of

selecting a foreperson, the jury asked to hear the tape again.   (*See id.* at 70, 76).   The tape-recorded

interview, including petitioner's admission that he had served time in prison for an aggravated assault

that was committed while he was intoxicated, was then played a second time.   (*See* SF-V at 165-68).

Three hours later, the jury found petitioner guilty of aggravated assault.   (*Id.* at 171-72).

The court is mindful of the deference accorded to state court findings under the AEDPA.

However, while these standards are demanding, they are not insatiable:

> Even in the context of federal habeas, deference does not imply
> abandonment or abdication of judicial review. Deference does not by
> definition preclude relief. A federal court can disagree with a state
> court's [factual] determination and, when guided by AEDPA,
> conclude the decision was unreasonable or that the factual premise
> was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003). Such is

the case with respect to the state court's assessment of prejudice. In view of the credibility issues

surrounding the state's only eyewitness, the similarity of petitioner's prior aggravated assault

conviction to the offense for which he was being tried, and the timing of the jury verdict after

listening to the tape for a second time, it "blinks reality" to suggest that petitioner was not prejudiced

by the admission of the tape. *See Miller-El v. Dretke*, 545 U.S. 231, 266, 125 S.Ct. 2317, 2340, 162

L.Ed.2d 196 (2005). This ground for relief should be sustained.

## C.

Petitioner also criticizes his attorney for failing to discover and call five witnesses--Nancy

Vega, Debbie Swalah, Blake Seiler, Carol Seiler, and Ed Seiler--who would have testified that Davis

was injured while trying to prevent petitioner from committing suicide. The gravamen of this claim

is that counsel failed to perform an adequate investigation by visiting the apartments where the

shooting occurred and where the potential witnesses either lived or visited on a regular basis and,

as a result, did not discover these witnesses in time to call them at trial.

"An attorney has a duty to independently investigate the charges against his client." *Bower*

*v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007), *cert. denied*, 128 S.Ct. 2051 (2008), *citing*

*Wiggins*, 123 S.Ct. at 2536-37. While the precise contours of a reasonable investigation are fact-

specific and not clearly defined, the Fifth Circuit has held that "[i]nformed evaluation of potential

defenses to criminal charges and meaningful discussion with one's client of the realities of his case

are cornerstones of effective assistance of counsel." *Id.*, *quoting Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir. 1981), *cert. denied*, 102 S.Ct. 2021 (1982). The reasonableness of an attorney's investigation depends, in part, on information supplied by the defendant. *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir.), *cert. denied*, 118 S.Ct. 361 (1997); *see also Strickland*, 104 S.Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . In particular, what investigation decisions are reasonable depends critically on such information."). When assessing the reasonableness of an attorney's investigation, the court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005), *quoting Wiggins*, 123 S.Ct. at 2538. To establish that counsel was ineffective for failing to investigate, "a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller*, 420 F.3d at 361.

Petitioner's claim fails for at least two reasons. First, there is no reason to believe that defense counsel was aware of the witnesses before trial, or would have discovered the witnesses had he visited the apartments where the shooting occurred. Only two witnesses, Debbie Swalah and Carol Seiler, claim any attempt to contact defense counsel, but it is not clear from their affidavits when those attempts were made. *See Ex parte Ard*, WR-58,788-03, Tr. at 585; C. Seiler Aff., 6/25/09.[5] Neither petitioner nor his mother, both of whom lived in the apartment complex where the shooting occurred, were aware of these witnesses prior to trial. *See id.*, Tr. at 509, 578. If petitioner

---

[5] Petitioner has filed a motion to expand the record to include the affidavit of Carol Seiler, who states that she wrote defense counsel prior to June 24, 2000, but was never contacted by him. (*See* Doc. #28 & Exh. A). However, the guilt-innocence phase of petitioner's trial concluded on June 2, 2000. (*See* St. App. Tr. at 72). Even if the court considers this affidavit, which was not presented to the state habeas court, it does not affect the recommended disposition of this ground for relief.

and his mother were unaware of potential witnesses who either lived in or frequented their apartment complex, there is no reason to believe that counsel would have discovered them on his own.[6] Moreover, even if counsel had been aware of these witnesses prior to trial, there is nothing to indicate that the witnesses were available and willing to testify. *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (to prove that counsel was ineffective for failing to call a witness, petitioner must demonstrate, *inter alia*, that the witness was available to testify at trial and would have done so). This ground for relief should be overruled.

## RECOMMENDATION

Federal courts must be "ever vigilant in ensuring that the constitutionally guaranteed rights of defendants in habeas corpus cases are not violated in substantial and injurious ways." *Shaw v. Collins*, 5 F.3d 128, 133 (5th Cir. 1993). The record in this case establishes that petitioner was deprived of his Sixth Amendment right to effective assistance of counsel when his attorney offered into evidence an audiotape recording that included prejudicial statements made by petitioner about a prior aggravated assault conviction. Accordingly, with regard to that claim only, petitioner's application for writ of habeas corpus should be conditionally granted. The writ should issue unless petitioner is retried within 90 days after these findings are approved by the district judge.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or

---

[6] To the extent petitioner argues that his attorney was actually aware of the witnesses prior to trial, an argument that was not made on state collateral review, his claim is unexhausted and procedurally barred. *See Wolfe v. Dretke*, 116 Fed.Appx. 487, 496, 2004 WL 2538383 at *7 (5th Cir. Nov. 10, 2004), *cert. denied*, 125 S.Ct. 2262 (2005) (court will not consider new factual allegations in support of a previously asserted legal theory where the "factual basis underlying a claim is different from those underlying the state claim").

recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED:  October 29, 2009.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE